1
2
3
4            UNITED STATES DISTRICT COURT
5            NORTHERN DISTRICT OF CALIFORNIA
6
7    REGINALD W. WYATT,                    Case No.  14-cv-00984-JD
          Petitioner,
8
     v.                                    ORDER DENYING PETITION FOR
9                                          WRIT OF HABEAS CORPUS AND
     MARION SPEARMAN,                      DENYING CERTIFICATE OF
10                                         APPEALABILITY
          Respondent.
11

12

13        Reginald Wyatt, a pro se state prisoner, has brought a habeas petition pursuant to 28

14   U.S.C. § 2254.  The Court ordered respondent to show cause why the writ should not be granted.

15   Respondent filed an answer and a memorandum of points and authorities in support of it, and

16   lodged exhibits with the Court.  The petition is denied.

17                                    **BACKGROUND**

18        Wyatt was found criminally responsible for the death of his 14-month-old son as a result of

19   his use of rough wrestling moves that caused severe internal injuries.  Wyatt was charged with one

20   count of murder and one count of assault on a child causing death ("child assault homicide").

21   Clerk's Transcript ("CT") at 97-99.  On April 11, 2006, the jury found Wyatt guilty of the lesser

22   included offense of involuntary manslaughter and child assault homicide.   CT at 327.  Wyatt was

23   sentenced to 25 years to life in state prison.  CT at 360.  This case was extensively litigated in the

24   state courts.

25        In 2008 the California Court of Appeal rejected several of Wyatt's claims but reversed the

26   conviction for child assault homicide.  *People v. Wyatt*, No. A114612, 2008 WL 258175 (Cal. Ct.

27   App. Jan. 31, 2008).  The court found that the evidence was insufficient to prove the requisite

28   mens rea because it failed to demonstrate that Wyatt knew he was wrestling too hard with his son.

United States District Court
Northern District of California

1    *Id.* at 15.  The California Supreme Court reversed and held that, "substantial evidence established

2    that defendant knew he was striking his young son with his fist, forearm, knee, and elbow, and that

3    he used an amount of force a reasonable person would realize was likely to result in great bodily

4    injury."  *People v. Wyatt*, 48 Cal. 4th 776, 779 (2010).  The California Supreme Court reversed

5    and remanded the case back to the Court of Appeal.  *Id.*

6            On remand in 2010 the California Court of Appeal rejected several of Wyatt's claims but

7    again reversed the conviction for child assault homicide.  *People v. Wyatt*, No. A114612, 2010

8    WL 5006753 (Cal. Ct. App. Dec. 9, 2010).  The court found the trial court prejudicially erred by

9    failing to instruct sua sponte on a simple assault as a lesser included offense of child assault

10   homicide.  *Id.* at 16-17.  In 2012 the California Supreme Court again reversed, finding no error

11   because there was not substantial evidence of simple assault to support the sua sponte issuance of

12   it as a lesser included offense instruction.  *People v. Wyatt*, 55 Cal. 4th 694, 703-04 (2012).  The

13   California Supreme Court ordered the appellate court to reinstate the child assault homicide

14   conviction.  *Id.*

15           The 2008 opinion of the California Court of Appeal summarized the facts of the crime as

16   follows:

17                   Prosecution Case
                     Charrikka Harris, mother of Reginald Wyatt Jr. (Reginald), met
18           appellant in March 2001.  They began a physical relationship,
             although Harris already had a boyfriend.  Harris found out she was
19           pregnant in July 2001, by which time appellant had another
             girlfriend.  At first appellant seemed okay with the pregnancy, but
20           shortly before Reginald was born, he said he did not think the baby
             was his and would not assume responsibility until he found out that
21           it was his baby.  After Reginald was born, appellant refused to sign
             his birth certificate because "it wasn't his baby."  He also refused to
22           take a paternity test or to provide any financial support.

23                   Subsequently, appellant and Harris agreed to go on the Maury
             Povich Show, which was doing a show about paternity.  Appellant
24           took a paternity test before being flown to New York for the show;
             he and Harris were also given spending money.  Povich announced
25           on the show that the paternity testing showed that appellant was
             Reginald's father.   After they returned to Oakland, appellant's
26           attitude changed.  For about two weeks, he would come to Harris's
             house to feed and play with Reginald.  Then, he and Harris got into
27           an argument about appellant's girlfriend and he stopped coming
             over.

28

Appellant still refused to contribute financially and Harris went to court to try to get appellant to help support Reginald and spend time with him.  Appellant then sought a restraining order against Harris. The court referred them to a mediator.  The court eventually ordered visitation for appellant for five hours every Saturday. Appellant was inconsistent in his visits.  Appellant was also ordered to pay $50 per week in child support, which he did.

After Reginald's first birthday, Harris agreed to let appellant take Reginald for overnight visits.  After the first overnight visit, Harris smelled marijuana on Reginald's sweater and also saw what appeared to be a burn on the back of his neck.  She called the police. A paramedic looked at the mark and said it was "'an old scratch.'" Another time, she found a lump with a scab on it on Reginald's chest.  She took him to the hospital.

On Saturday, May 17, 2003, after agreeing that appellant could take Reginald for the weekend, Harris met appellant and he took Reginald with the plan that Harris would pick Reginald up the next day.  Appellant had asked a few days earlier if he could take custody of Reginald and whether Harris would let Reginald move in with appellant and his girlfriend.  Harris said she would think about it. Reginald was then 14 months old.

Tiffany Blake was appellant's girlfriend.  They lived together in Oakland and had been together since 2002.  Their daughter, Valerie, was born in February 2003.  On Saturday, May 17, 2003, Reginald came to spend the night with appellant, Blake, and Valerie in their apartment.  It was about the third time he had spent the night with them.  Reginald slept on a pallet-a makeshift bed on the floor with a comforter, blankets, and a pillow-at the side of the bed.  On Sunday morning, May 18, Blake got up at around 7:00 a.m. to get ready to go to work.  It was her first day back at her job after a maternity leave and she had to be at work by 10:00 a.m.

Blake left the apartment at about 9:00 a.m. to catch the bus to work. Before that, she saw appellant playing with Reginald.  He was lifting Reginald up in the air over his head, spinning him around, and bouncing him down onto the bed.  Reginald had a blank look on his face and Blake said to appellant, "Maybe you shouldn't do that. Maybe he doesn't like it.  Maybe he's not having fun."  After that, she saw Reginald sitting and watching television until she left for work.

At about 10:00 a.m., appellant called Harris and left a message that Reginald had had an asthma attack and needed his asthma machine. He sounded nervous.  When appellant called back, Harris answered the phone.  Appellant said Reginald could not breathe; he also said an ambulance and the police were there.  Harris hung up the phone and rushed to Children's Hospital in Oakland, where she assumed Reginald would be taken.   Appellant also called Blake at work between 11:00 a.m. and 12:00 p.m.  Appellant told her that Reginald was not breathing and he was waiting for an ambulance.  He called her back 20 to 30 minutes later on her cell phone.  He was crying and said Reginald had died.

At about 10:45 a.m., Douglas Curtis, who lived in appellant's apartment building, heard a knock at his door and saw a person there holding a baby in his arms. Another baby was sitting on the floor outside. The man said, "'Would you please dial 911? My baby is not breathing.'" The man, who looked scared, said the baby had asthma and that he had tried to call 911 but could not get through. So Curtis called 911 and, in about five or ten minutes, an ambulance and paramedics arrived.

When paramedics arrived, Reginald was lying on the sidewalk and a firefighter was administering C.P.R. Reginald was not breathing and there was no pulse. An endotracheal tube was placed in his mouth and other efforts to revive him were made, but the efforts were not successful. The paramedics then transported him to the hospital.

Oakland Police Officer Kaizer Albino obtained a statement from appellant while paramedics were still treating Reginald on the sidewalk. Appellant "was quite emotional. He was upset. His attention was focused on his son. He was not all there, so he wasn't responding to my questions." Therefore, Albino suggested they go up to appellant's apartment, which they did. In the statement obtained from appellant, appellant said he was playing with his two children that morning, after which he gave his son a cup of milk and put him down on the floor. Appellant then lay on the bed with his daughter and fell asleep. When he woke up, appellant noticed that Reginald was not breathing and had green fluid coming from his nose.

At the hospital, when doctors could not revive him, Reginald was pronounced dead. Other than a little scratch on his chin, the treating doctor saw no signs of injury or trauma on Reginald's body. Sergeant James Rullamas initially believed it was a SIDS death and asked appellant to fill out a form for the coroner's office. The form contained a question about a history of fall or accident, and appellant said Reginald fell out of his arms as he was trying to get out the door to get help. Appellant said there were no other falls or accidents.

The next day, Monday, May 19, 2003, appellant, his brother Anthony, Harris's sister, and a friend were at Harris's house when the coroner called and told Harris that the autopsy results were in and that Reginald had broken ribs, a severed liver and spleen, and had died from blunt trauma. He also said officers were en route to "pick up" appellant. Harris hung up the phone and said to appellant, "They're going to arrest you." Appellant and his brother then drove to the Oakland Police Department.

On that Monday morning, after he learned the results of the autopsy, Sergeant Rullamas asked officers to prepare an arrest warrant and to arrest appellant for murder. Before any arrest was made, Rullamas learned that appellant had come to the police station with his brother, Oakland Police Officer Anthony Caldwell. Sergeants Rullamas and Nolan interviewed appellant after reading him his *Miranda* rights. In accordance with normal procedures, they interviewed appellant before taking a tape-recorded statement.

Rullamas acknowledged that it was a difficult interview because appellant's brother was an Oakland police officer whose work Rullamas respected. However, harsh tactics were not necessary with appellant. It was "a very, very soft interview" since appellant "responded to kindness," which is "fairly unique."

Two tape-recorded interviews were made and were played for the jury during trial. In the first tape-recorded interview, which began at 6:14 p.m., appellant said that, after he got up on Sunday morning, he was wrestling and playing with Reginald. He was lifting him up and dropping him on the bed. Appellant described an accident that occurred while Blake was still home. Appellant was doing a move called "comin' off the top rope." As he jumped on the bed, Reginald rolled unexpectedly and appellant's hip came down on his stomach with most or all of appellant's body weight of 170 pounds. Reginald grunted like the wind had been knocked out of him. Blake then said he was playing too rough with Reginald and could hurt him, so he stopped. Reginald did not cry during any of this. He was laughing and then, after appellant fell on him, he still had a smile on his face.

After Blake left for work, appellant began playing with Reginald again. They played for 20 or 30 more minutes. He might have hit Reginald harder at that point in their play, since Blake was gone. He continued wrestling with Reginald, except he did not "come off the top rope" since he had jumped on him earlier. Appellant body slammed Reginald about four times, hit Reginald in the chest with his fist about 10 or 11 times, did the "atomic elbow" to his head, hit him in the upper chest with his forearm about three times, and then hit him in the back. Appellant also held Reginald around his neck while he had him up in the air, squeezed him between his legs, hit Reginald in the back twice with his knee (the knee drop), and did the body slam and pretend head butts. He boxed with Reginald and did the supplex many times, which involved flipping Reginald over his body onto the bed; that move made Reginald laugh every time. Appellant did not think he was hurting Reginald because he was playing with him.

When Rullamas had asked appellant at the hospital the previous day if there was any history of fall or accident, appellant did not tell him about the wrestling or falling on Reginald because he was just playing with him and "didn't think that had anything to do with anything." He was not trying to hide anything; he just did not think that was the cause.

Sergeant Nolan noted that Sergeant Rullamas had earlier talked about every man wanting his son to be kind of tough, to be able to take it and be a man, to which appellant responded, "[H]ere my son ... he's not movin' around. I just wanted him to move around ... and be active.... [¶] ... [¶] All I was tryin' to ... just kinda toughen him up. Because this ... it's hard out here. Y'all know how many people get killed out here, too...."

When Nolan asked if he or Rullamas had made any threats or promises to appellant, appellant responded in the negative. When Nolan said, "We treated you pretty nice?" appellant said,

"Extremely."

The interview concluded at 7:16 p.m. Rullamas and Nolan left the interview room and went over appellant's statement. Much of what appellant said did not make sense to Rullamas and he thought "there had to be some kind of anger in there, some kind of punishment, or something in there, in my mind, and I wanted to ask him about that." At 8:00 p.m., they returned to the room to discuss this with appellant. Appellant said "he was trying to toughen [Reginald] up a little bit, but that none of it was out of anger." Appellant also said that it was not an attempt to discipline his son, and that his form of discipline was just to take toys away from him. Nor did it have anything to do with any frustration he was feeling.

The officers then left the room again and called the district attorney's "call-out team." A representative from the district attorney's office came to the police station, along with her inspector, after 9:00 p.m. After Rullamas briefed them on the case and they listened to the tape statement, the team wanted the officers to attempt to obtain additional information in three areas: (1) why was the child with appellant outside of the hours prescribed by the court order; (2) how many times in the past had Reginald been at appellant's apartment; and (3) what was Tiffany Blake's role in raising the child.

Therefore, the officers returned to the interview room and asked appellant additional questions. Regarding the court order for visitation, appellant said he and Harris had made plans for Reginald to start spending more time with him and he wanted Reginald to get used to living with him. He also said that Reginald had spent the night at his apartment six or seven times and that Blake helped with Reginald's care.

At 11:23 p.m., Rullamas and Nolan began a second taped interview with appellant. Appellant said he was not really thinking about anything when he was wrestling with Reginald; his mind was going blank. It was "[l]ike I just had a one-track mind. I was just stuck on toughening him up, playin' with Reggie, beatin' up Reggie," by which he meant "play fighting with him." When appellant said his mind went blank, he meant that "my mind musta went blank, though, for me to really ... hit him hard enough ... to hurt him, and I not notice it. I wasn't payin' attention, and I wasn't thinkin'.... [¶] ... [¶] ... But then ... came to a point where it got more serious than that, and I didn't notice and I wasn't thinkin' ... that I can hurt him. I wasn't thinkin'. [¶] ... [¶] [It got more serious] because he was hit too hard. He was hit too hard, and I wasn't ... doin' nothin' to, you know, not hit him no harder." When asked how hard he was hitting Reginald, appellant said, "I was hittin' him pretty hard."

Appellant said he did not listen when Blake told him to stop being so rough because he was "[h]ard-headed. Stubborn. Stuck in my ways. Didn't want a woman to be tellin' me how to raise my son." Appellant said he had wrestled with Reginald before, but this was the first time he wrestled with him "like this," "[t]o this point ... where I was outta control." Appellant thought he lost control at the time he started slamming Reginald on the bed. He said, "14 months old. Just a little baby. Shouldn'ta been playin' wit' 'im like that."

When asked what made it turn from play wrestling to real wrestling, appellant said, "Just wasn't thinkin' at all.  Just wasn't thinkin'."

Appellant said after he landed on Reginald, Reginald lay down and appellant said, "'Nah, it ain't time to go to sleep.  Come on.'  And we just kep' on playin'."  Appellant also acknowledged that he felt pressures related to money, getting his barber's license, "[j]ust the every day hustle and bustle ... just tryin' to make it.  Tryin' to stay out the way."  This interview ended at 11:39 p.m. and appellant was taken to jail.

Rullamas interviewed Tiffany Blake on May 21, 2003.  The jury listened to Blake's tape-recorded interview during trial.  During the interview, Blake said appellant started playing with Reginald on the Sunday morning.  He would lift Reginald up in the air, swing him around, and put him on the bed.  Reginald was crying and so Blake told appellant not to play with him like that, that she thought he was playing too rough.  She thought maybe it scared Reginald to be up in the air.

Blake said appellant had never done anything that caused her concern regarding his ability to care for his son or their daughter.  He had never done anything reckless or dangerous and was a good father.  They were trying to get custody of Reginald and were working on getting themselves together so they could have both children and support them financially.  They were having Reginald stay over on the weekends so he could get used to staying with them.

Dr. David Levin, a pathologist, performed an autopsy on Reginald's body on May 19, 2003.  Reginald, who was 31 inches tall and weighed 26 pounds, died of shock and hemorrhage due to blunt force trauma to the chest and abdomen.  During an external examination of the body, Dr. Levin found an abrasion on the chin and two abrasions on the neck.  There was a laceration of the frenulum of the upper lip and a contusion on the chest.

Internally, Dr. Levin found an internal contusion to the forehead, hemorrhage on the surface of the heart, on the tissue behind the heart, and at the hilus of the left lung.  There were multiple lacerations to the liver, which caused internal bleeding of 200 milliliters of blood into the abdominal cavity.  There was also hemorrhage behind the abdominal cavity and hemorrhage in the mesentery of the small and large intestines.  There were acute fractures of the fifth and sixth ribs on both the right and left side of the back of the body.  There was also mild cerebral swelling.

Reginald's injuries were consistent with blunt force trauma to his back, abdomen, chest, and head.  Some of the injuries could have been caused by a person who weighed 170 pounds jumping up and landing with his hip onto the midsection of the child.  They also could have been caused by multiple instances of blunt force trauma.  There would not necessarily be bruising, especially in softer areas like the abdomen.  The laceration to the frenulum could have been caused by blunt force to the face or something being jammed into the mouth.  The cerebral swelling could have been caused by blunt

force trauma to the head, by changes occurring during the dying process, or by administration of a large amount of fluids by medical personnel in an attempt to regain blood pressure. The contusion on the chest could have been caused by someone attempting to administer CPR, but CPR would not have caused the fractured ribs in the back of the body.

A child who suffered these injuries would not die instantaneously and Dr. Levin would expect that the child would cry. Death could occur in less than an hour up to many hours.

Dr. James Crawford, medical director of the Center for Child Protection at Children's Hospital in Oakland, testified as an expert in pediatrics, in the medical evaluation of child abuse. Dr. Crawford reviewed Reginald's autopsy protocol. Reginald's injuries were "at the end of the bell curve," that is, at a level of injury that is uncommon in a one year old. The types of injuries he suffered, including the multiple lacerations to the liver and the multiple sites of internal bleeding, "are seen only in the most serious events," such as children who are in car crashes or hit by motor vehicles.

The likelihood that Reginald's ribs were broken during CPR was "extraordinarily small." The fractures could conceivably have been caused by blunt force trauma to the child's back, but would have to have been "something that would have been quite violent, quite out of the ordinary," given how uncommon rib fractures are in children. Unless he was unconscious or had a profound neurological condition, a child would be expected to react to the types of injuries shown to have occurred here by crying and clearly demonstrating that he was in distress.

As to his opinion regarding how many times Reginald must have been hit in order to receive these injuries, Dr. Crawford believed there had to have been "at least multiple, and potentially many impacts." It is remotely possible that one extremely violent lateral compression could have caused all of the significant injuries. However, it is more likely that the injuries were caused by more than one blow. Dr. Crawford explained, "[T]he fewer number of impacts that one is invoking, to explain it, the more violent those impacts have to be. So a single event would-it was, you know, to crush the child's body this way would have been an extraordinarily violent act, in order to cause all these injuries at the same time, as opposed to multiple lessers, but still dangerously violent acts, to different parts of the body." The level of violence would be equivalent to getting hit by a motor vehicle or being a passenger in a car crash.

Defense Case
Appellant, who was 31 years old at the time of trial, testified on his own behalf. He lived in Winfield, Louisiana until he was 28 years old, at which time he moved to California. He initially lived with his brother and his stepmother in Oakland. His jobs in California included working at a bar, working at Kmart, and working at a mattress warehouse. He had prior convictions in Louisiana for battery on a police officer, possession of a weapon, and possession with intent to distribute cocaine.

When appellant met Charrikka Harris, he thought he was sterile because he had "slept with a lot of girls" and none of them got pregnant. When Harris got pregnant, he did not think the baby was his. Reginald was born on March 6, 2002. He went on the Maury Povich Show to find out if Reginald was his baby. Once he learned Reginald was his baby, he wanted to be with him. He saw Reginald almost daily for a couple of weeks, but then stopped coming by Harris's home very much and seldom saw his son, partly because he and Harris would always argue.

After appellant and Harris went to a mediator, he saw Reginald more often. When he and his girlfriend, Tiffany Blake, moved to Walnut Street in Oakland, in February 2003, he saw Reginald even more regularly because he now had a more stable residence. Reginald spent the weekend with appellant five or six times before Reginald's death. Appellant never struck Reginald except for one time when he slapped Reginald on the hand for playing with the steering wheel in the car. Appellant never had to discipline Reginald because he was a good baby and easy to care for.

On Saturday, May 17, 2003, Harris brought Reginald to appellant for a weekend visit. On Sunday morning, while Blake was getting dressed for work, appellant started playing with Reginald, swinging him up in the air and putting him on the bed. Blake told him he was playing too rough with Reginald, who was whining. After Blake left the apartment, appellant began playing with Reginald again, picking him up and tossing him on the bed. Reginald laughed while appellant did this. Appellant also put Reginald on the bed and jumped on it to make it shake, which he had done in the past.

Appellant never did any wrestling moves on his son. When he described to the police the wrestling moves he did on Reginald, it was all pretend wrestling he was talking about. He never struck Reginald hard, only pushed him while playing with him and doing "make-believe wrestling moves," such as off-the-top-rope, head butt, suplex, and an atomic elbow to the head. At one point, an accident occurred. Appellant had jumped in the air and was coming down on the bed to make it shake, when Reginald rolled toward him and appellant fell on Reginald, hitting Reginald in the back with his hip. It seemed like Reginald had the wind knocked out of him, like he could not get his breath. Then he started breathing again and appellant thought he was all right. Reginald did not cry. Other than falling on Reginald, appellant did not strike him with force or do anything harmful to him.

Appellant stopped playing after he fell on Reginald. He got Reginald some milk and sat him down on the floor on his pallet. Reginald took his milk, looked at the television, and then lay down. Appellant lay down on the bed with his daughter, Valerie, and drifted off to sleep. It was about 10:00 a.m. at that point.

When appellant woke up, he saw that Reginald was not on his pallet; he was on the floor. He tried to wake Reginald up, but he was not responsive. He was breathing faintly and appellant hit him on the back and opened his mouth in case something got stuck in there, and

then tried to do CPR on him.  He also called his stepmother and Harris, but neither one answered the phone.  At first, he did not think to call 911 because in his hometown there was no 911.  Then he tried to call 911, but could not get through.  As he did CPR, some green matter came out of Reginald's nose and appellant panicked.

He picked up Reginald in one hand and Valerie in the other and started to leave the apartment, but stumbled over a diaper pail and dropped both children.  Reginald's head hit the floor.  He picked up both children and went to a neighbor's door, where he told the neighbor that his son was not breathing.  The man said he would call 911, and the person on the line talked to appellant as he tried to do CPR again until the ambulance came.

While the paramedics were working on Reginald, a police officer asked appellant questions.  Appellant did not tell the officer that he had been playing with Reginald and had fallen on top of him because appellant was focused on what was happening to his son and he also did not make a connection between falling on Reginald and his condition.  While riding to the hospital, appellant learned that Reginald was dead.

Appellant spent the night at the home of his brother, Anthony Caldwell, where he only got a little bit of sleep.  The next afternoon, appellant's brother drove them to Harris's house.  Harris was there with her sister and one or two other people.  The coroner's office called while appellant was there.  Harris answered the phone; a short time later she said, "blunt trauma," and dropped the phone.  She was crying and in a state of shock.  As appellant tried to comfort her, Harris's sister came in and said someone had hit Reginald in the chest hard.  No one accused appellant of killing Reginald, and appellant did not know what had caused Reginald's death.  Appellant first learned during trial that his act of falling on Reginald could have caused his son's substantial injuries.

Caldwell suggested going to the police station because the police wanted to talk to appellant.  They went to the police station and Caldwell spoke with Nolan and Rullamas who said that they were just going to ask appellant a few questions and would be through in a few hours.  The officers told appellant, "'We'll take care of you,'" and also said after he answered the questions, they would let him go back home to his family.  Caldwell told appellant to "cooperate with them in every way, that they [are] going to take care of you, that these [are] some good guys."  Appellant did not think he needed a lawyer because the officers just wanted to talk to him.  He did not realize they had already issued a warrant.

Appellant was tired from lack of sleep and his mind was in a complete daze.  He told the officers that he had been playing with Reginald when he accidentally fell on his son.  He also explained that he was play-wrestling with Reginald.  As he described the various wrestling terms, he "just kind of took on the terms," saying, "'I body-slam him,' whatever."  He thought the officers understood he was talking about play-wrestling.  Then, when the officers said "it had to be [something] more [than just falling on Reginald], I feel like, well, in my mind, I start second-guessing myself, even though I

10

knew what I was doing, I start second-guessing myself ... so I start being like, well, maybe I did hit him harder than what I really thought I was...."  His mind was "just shredded" with grief and appellant felt shame and guilt about what had happened.  Then, given that the officers would not take him at his word, he thought maybe he was not remembering it clearly and maybe he had hit his son hard and had not realized it.  He thought the officers had the facts, so he went along with what they said.

The officers did not start tape recording appellant's statement until they got him to say that he had hit his son hard while wrestling with him.  Also before taping him, Sergeant Rullamas said something about every man wanting his son to be kind of tough, but appellant had only said that Reginald was good and sat still a lot, and appellant wanted him to be more active.  Then, on tape, appellant said he wanted to toughen him up, by which he only meant make him more active.

After the first tape-recorded interview, the officers left the room, then came back and said "[t]his is not adding up.  Something else had to happen."  They also said, "[s]ometimes people lose control, and it's all right.  You know, we're all human, and we make mistakes.  You know, the D.A.s are having a hard time understanding this."  The officers introduced a new theme of appellant's losing control and being angry when Reginald got hurt. Later that night, the officers took a second tape-recorded statement. With both statements, it seemed like everything was scripted, with the officers and appellant "[getting] the answers down" before making the recordings.  Appellant explained that when he said on the second tape that his mind went blank and he lost control, he meant he had just been playing without thinking about anything and he put his son in jeopardy by playing with him.  By the end of the second interview, appellant had been convinced that he had blacked out, struck his son too hard, and killed him.  In fact, appellant did not recall blacking out or hitting Reginald too hard.  He was just tired and wanted to go home, and the officers would not accept his initial answers.

Anthony Caldwell testified that he is three years older than appellant.  They have the same mother, but different fathers. Caldwell became a police officer in Oakland in 1999 and was an officer at the time of appellant's arrest.  He and appellant grew up in a very segregated town in Louisiana where Black people knew to "stay in your place when authorities approach you for anything." Because appellant's mother worked at the school board and his uncle and brother played football, their family got more favorable treatment than other Black people.  Caldwell had seen appellant interact with children and he was always fun, loving and playful; the kids loved him.  He never saw appellant get angry or frustrated with young children.

Appellant was elated when he learned that Reginald was his son, and became more focused on barber college and obtaining his license.  Caldwell never saw appellant express any frustration toward Reginald.

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

The day after Reginald died, Caldwell took appellant to Harris's house to make funeral arrangements.  While they were there, the coroner called with the autopsy results.  Harris started screaming, "'He beat my baby.  He beat my baby.'"  Caldwell called the police station and talked to Nolan, who said he needed to talk to appellant.  Appellant told Caldwell to take him to the police station, which Caldwell did.  Caldwell told appellant that he had nothing to hide and to just be truthful with the officers.  Rullamas and Nolan said that they would take care of appellant and that he could call them when they finished the interview, in maybe two or three hours.  When they said they would take care of appellant, Caldwell understood it to mean simply that they would treat him fairly.  He believed he would be able to pick appellant up after the questioning, not because of anything the officers said, but because Reginald's death had so clearly been an accident.  Appellant had told him that he had been playing with Reginald when he accidentally fell on him.

Patricia Street, appellant's mother, testified that appellant had been evaluated when he was in fourth grade and was classified as hyperactive.  Appellant attended college briefly, but dropped out.  Appellant was excited when he learned Reginald was his son.

Elayne Caldwell, appellant's stepmother, testified that appellant lived with her for about two years starting in 2001 and sometimes took care of her granddaughter.  Appellant was always a considerate, kind, loving person.  She saw appellant with Reginald on numerous occasions and appellant had nothing but love for his son, and wanted to have more time with him.

Lionell Johnson, appellant's uncle, testified that he helped raise appellant.  He never knew him to have a violent temper or to do any act of violence toward a child.  Appellant treated Johnson's children with love and they loved and respected him.

Dr. Paul Herrmann, a pathologist, testified as an expert in the field of pathology.  He had reviewed Reginald's autopsy records and believed Reginald's injuries could have resulted from a single sharp blow to the back right side, such as from the weight of a 170-pound man falling on him.  The injuries were not consistent with the child being beaten with fists because there was little bruising of the body.  However, other forms of abuse, such as the child's abdomen being smashed onto one's knee would probably not leave a bruise because a knee is such a large, blunt object.  If a heavy weight were dropped on the child when the child was on the floor, a large blunt object would not cause bruising, but would compress the body, with the force causing the ribs to break and the liver to be lacerated.  It was equally probable that Reginald's major injuries were caused by a single blow as by multiple blows.  Dr. Herrmann believed the injuries to Reginald's heart were likely due to the administration of CPR.  The cause of the tear to Reginald's frenulum was as consistent with an endotracheal tube being placed in his mouth as with violent force.

On cross-examination, Dr. Herrmann said he believed the chances of Reginald being injured by a person falling on him on a bed would be

12

much less than if the child were on the floor.  It would be much less common for such extreme injuries to occur if the child was on a bed when someone fell on him.  However, "it's still a likelihood or a possibility."  The injuries here would be excessive to what Dr. Herrmann would expect if someone fell sideways onto the child on a bed, as compared to someone "falling free" onto the child.  He did not have an opinion as to whether Reginald was physically abused.

After receiving these severe injuries a child might be screaming from pain or might go into shock immediately and be absolutely still. Either way, Dr. Herrmann believed a caregiver would notice a difference in the child after such injuries were sustained.  Reginald's death was not immediate; he bled to death.  If he went into shock, it is possible that he lay down or appeared to be going to sleep.

Rebuttal
Rullamas testified on rebuttal that neither he nor anyone in his presence ever told appellant that he would be finished in a few hours; that he could go home afterwards because he needed to be with his family; or that, after he finished answering questions, he could go home.  In fact, a warrant for appellant's arrest had already been issued and he was going to be arrested regardless of whether he talked to the officers.  Rullamas never brought up the idea that appellant was trying to toughen up his son.  Rather, appellant mentioned that his child was acting like a baby and appellant wanted to toughen him up because of the environment in Oakland.  He never told appellant that he must have lost his temper or that the district attorney was having a hard time understanding how it was he lost control and that appellant should "'just say this so the D.A. can understand it better.' "

*Wyatt*, 2008 WL 258175, at *1-12.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by

13

1   [the Supreme] Court on a question of law or if the state court decides a case differently than [the

2   Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

3   A state court decision is an "unreasonable application of" Supreme Court authority, falling under

4   the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the

5   Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

6   case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that

7   court concludes in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be

9   "objectively unreasonable" to support granting the writ.  *Id.* at 409.

10          Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will

11  not be overturned on factual grounds unless objectively unreasonable in light of the evidence

12  presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v.*

13  *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, in conducting its analysis, the federal

14  court must presume the correctness of the state court's factual findings, and the petitioner bears the

15  burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

16          The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

17  state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

18  1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court to

19  consider the petitioner's claims, the Court looks to the last reasoned opinion.  *See Nunnemaker* at

20  801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

## DISCUSSION

22          As grounds for federal habeas relief, Wyatt asserts that: (1) his rights were violated

23  because the trial court excluded certain evidence at a pretrial hearing; (2) the trial court failed to

24  issue a unanimity instruction; (3) the jury instructions omitted an essential element of child assault

25  homicide; (4) the trial court failed to instruct the jury that criminal negligence cannot support an

26  assault conviction; and (5) there was insufficient evidence to support child assault homicide.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.   PRETRIAL HEARING

Wyatt argues that his rights to due process and confrontation were denied because the trial court improperly limited cross-examination of a police officer at the pretrial hearing on the voluntariness of Wyatt's statement.  He argues that the trial court erred when it sustained two objections to trial counsel's questions related to the police officer's alleged habit of getting suspects to talk by stating he was there to help and that they could return home if they provided a statement.

### Legal Standard

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).  Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Generally speaking, a court errs under the Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic. *Fenenbock v. Director of Corrections*, 692 F.3d 910, 919 (9th Cir. 2012).  "Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

A defendant establishes a Confrontation Clause error by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680; *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009).  The focus of this inquiry "must be on the particular witness, not on the outcome of the entire trial," *Van Arsdall*, 475 U.S. at 680; defense counsel's ability to impeach other witnesses "is irrelevant" to whether the trial court violated the Confrontation Clause, *Slovik*, 556 F.3d at 754-55.  A limitation on cross-examination will fail

15

1    under the Confrontation Clause if it prejudices the defendant and denies the jury sufficient

2    information to appraise the biases and motivations of the witnesses.  *United States v. Urena*, 659

3    F.3d 903, 907-08 (9th Cir. 2011).

4         A person in custody pursuant to the judgment of a state court can obtain a federal writ of

5    habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or

6    treaties of the United States.  28 U.S.C. § 2254(a).  A state court's evidentiary ruling therefore is

7    not subject to federal habeas review unless the ruling violates federal law, either by infringing

8    upon a specific federal constitutional or statutory provision or by depriving the defendant of the

9    fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984);

10   *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d

11   1083, 1085 (9th Cir. 1985).

12        **Analysis**

13        Sergeant Rullamas testified in a pretrial hearing regarding Wyatt's statement to police.

14   Reporter's Transcript ("RT") at 1-42; CT at 233 (transcript of interview).  Wyatt agreed to speak

15   to the police after receiving *Miranda* warnings.  CT at 233-34.  Wyatt stated that the police treated

16   him extremely nice.  CT at 266.  After trial counsel concluded his cross-examination of Rullamas,

17   the trial court asked Rullamas if he had made any threats or promises to get Wyatt to talk.  RT at

18   39.  Rullamas stated he did not and noted that Wyatt said he was treated nicely.  *Id*.  Trial counsel

19   then requested to ask more questions and the following occurred as described by the California

20   Court of Appeal:

21        "[Defense counsel]: And you were telling him the whole time that
          you were there to help him, right?

22        "[Rullamas]: No.

23        "[Defense counsel]: Did you ever say that to him? Do you
          remember?

24        "[Rullamas]: No.

25        "[Defense counsel]: You don't remember saying that?

26        "[Rullamas]: No.

27        "[Defense counsel]: But sometimes you do say that during your

28        interviews.  Isn't that right?  That you're there to help the person

you're interviewing?

"[The prosecutor]: Objection.  Irrelevant.

"The Court: Sustained.

"[Defense counsel]: Well, it goes to his habit and custom.  His bearing on-

"The Court: Sustained.

"[Defense counsel]: I've got no-is that whole area going to be sustained on?

"The Court: Sustained, the objection to that question.

"[Defense counsel]: Isn't it true you told him you were going to take care of him, and if he just provides you with certain information that he was going to be okay, and that he was going to go home that night?

"[Rullamas]: No.

"[Defense counsel]: Isn't it true you told him if he just gave you some of the details, that he would go home that night?

"[Rullamas]: That is not true.

"[Defense counsel]: Okay.  Now you do say that sometimes to people in order to have them give you confessions.  Isn't that true?

"[The prosecutor]: Objection.  Irrelevant.

"The Court: Sustained."

Defense counsel moved on to other questions but, during argument on the question of voluntariness, counsel said he had been precluded from going into whether appellant was persuaded to give his statements "by tactics of bold-face lies."  The court responded: "No, you weren't.  I sustained two objections to questions that basically asked, 'Well, you've used that tactic with other people in the past.'"  The following exchange then took place between defense counsel and the court:

"[Defense counsel]: Right.  To show the habit and custom of that officer.
"The Court: That's all I sustained objections to.  I did not cut you off from inquiring into that.  I don't care what he may have done in the past.  What's at issue is what he did here.  And in the absence of any-here has been no evidence presented so far-and I haven't asked, actually.  I should ask you-I don't know if I asked.  Did I ask you if you wanted to present any evidence?

"[Defense counsel]: No, you didn't.

"The Court: Do you?

17

1    "[Defense counsel]: No.

2    "The Court: Okay. There's no evidence that that's what was done
     here, so if there ever was a time in the past when he used such a
3    tactic, it's not relevant to me.  It's just not. At any rate-

4    "[Defense counsel]: Anyway, you understand the theory.

5    "The Court: Absolutely. And all I did was sustain the objection to
     two questions, which asked about tactics he may have used with
6    other people in the past.  Those are the only two objections that even
     remotely relate to what you're talking about, so I've got to disagree
7    with you about what I precluded you from doing.  I didn't preclude
     you from inquiring into the subject matter.  As a matter of fact, you
8    did.  He denied it.  You asked him point blank.

9    "[Defense counsel]: That's why I wanted to get into his habit or
     custom.
10
     "The Court: Yeah, but it's not relevant to me.
11
     "[Defense counsel]: Fine.
12
     "The Court: Particularly since you've got to keep in mind, your
13   question wasn't even, 'That's what you usually do, isn't it?' [¶]
     Your question was, 'Well, there have been occasions in the past
14   where you have used that tactic,' so that doesn't even establish habit
     and custom, if you want to get picky about it.  But at any event,
15   those were the objections I sustained along those lines, so I just got
     to take issue with what you feel I cut you off from, because I didn't
16   cut you off from that line of questioning.   But rather just those
     particular questions about what he had done in the past, not with this
17   defendant. [¶] As to what he did with this defendant, you asked him,
     he gave you a direct answer, and to that extent, it covered the subject
18   matter that I consider to be relevant."

19   The court then ruled that appellant's statements "were made freely,
     voluntarily, after proper *Miranda* warnings."
20
     *Wyatt*, 2008 WL 258175, at *16-17.
21
          The California Court of Appeal then described relevant state law and denied this claim.
22
          Here, the trial court made clear that it had not precluded
23   appellant from asking questions or presenting evidence regarding the alleged
     habit or custom of Sergeant Rullamas and the Oakland Police
24   Department of making false promises to defendants to induce them
     to make statements.   As the court stated, it simply sustained
25   objections to two questions, not regarding what the officer
     habitually did during interviews, but instead regarding whether he
26   had "sometimes" told defendants that he was there to help them or
     that they would go home after answering questions.  These questions
27   did not relate to Rullamas's or the Oakland Police Department's
     "'regular or consistent response'" to interrogation of suspects.
28   (*People v. Memro*, *supra*, 38 Cal. 3d at p. 681, fn. 22; *see People v.*

United States District Court
Northern District of California

1

2

3

> *Hughes*, *supra*, 27 Cal. 4th at p. 337 [no abuse of discretion in exclusion of testimony of two defense witnesses that, on occasions when felony-murder victim cleaned her apartment, she left door partly open because proffered evidence was insufficient to establish that victim had such a habit or custom].)

4

5

> Since answers to the two questions at issue would not have demonstrated that Rullamas habitually said these same things to defendants, we conclude the trial court did not abuse its discretion when it sustained the prosecutor's objections.  FN14

6

7

8

> > FN14. Having concluded that the court did not improperly limit defense counsel's cross-examination of Sergeant Rullamas, it follows that there was no violation of appellant's rights to a fair hearing and to confront witnesses.

9

*Wyatt*, 2008 WL 258175, at *18.

10

Wyatt has failed to demonstrate that the California Court of Appeal's decision was an

11

unreasonable application of Supreme Court authority or an unreasonable determination of the

12

facts.  It was the trial court that initially asked if Rullamas promised or threatened Wyatt, after trial

13

counsel finished his questioning.  After raising this issue, the trial court allowed trial counsel to

14

continue asking questions.  The trial court sustained two objections to questions about whether

15

Rullamas "sometimes" told defendants in other interviews that he was trying to help them or that

16

they could go home if they provided a statement.  Rullamas already answered that he did not state

17

that to Wyatt nor is it reflected in the transcript of the audio interview that he made such a

18

statement.  Trial counsel retained the ability to rephrase the questions in a manner that was

19

consistent with the state evidence code to determine if Rullamas had a habit or custom of asking

20

these types of questions.  The California Court of Appeal found that trial counsel's questions did

21

not properly seek evidence of habit under state law and that decision is binding on this Court.  *See*

22

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas unavailable for violations of state

23

law or for alleged error in the interpretation or application of state law).

24

Under these circumstances, there was no violation of the right to confrontation.  Wyatt has

25

not met his burden in showing that this minor limitation of the testimony prejudiced him and

26

denied him an opportunity to appraise the biases and motivations of the witness.[1]   Nor has Wyatt

27

28

---

[1] No evidence has been offered that Rullamas had a habit or custom of telling defendants that he was trying to help them or that they could go home if they provided a statement.

19

1   shown that the evidentiary ruling deprived him of a fundamentally fair trial under due process.

2   This claim is denied.

3   **II.    UNANIMITY JURY INSTRUCTION**

4        Wyatt next argues that the trial court erred by failing to sua sponte issue a unanimity

5   instruction for both counts.

6        **Legal Standard**

7        A challenge to a jury instruction solely as an error under state law is not cognizable in

8   federal habeas corpus proceedings.  *Estelle*, 502 U.S. at 71-72.  Federal habeas relief is available

9   for instructional error only if the error "so infected the entire trial that the resulting conviction

10  violate[d] due process."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Petitioner must show

11  that there is a "reasonable likelihood" that the jury misapplied the instruction.  *Estelle*, 502 U.S. at

12  72.  "It is well established that the instruction 'may not be judged in artificial isolation,' but must

13  be considered in the context of the instructions as a whole and the trial record."  *Id.*  A

14  determination that there is a reasonable likelihood that the jury has applied the challenged

15  instruction in a way that violates the Constitution establishes only that an error has occurred.

16  *Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also must

17  determine that the error had a substantial and injurious influence in determining the jury's verdict,

18  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.

19  *Calderon*, 525 U.S. at 146-47.

20        Criminal defendants in state court have no federal constitutional right to a unanimous jury

21  verdict.  *Apodaca v. Oregon*, 406 U.S. 404, 410-12 (1972) (rejecting Sixth Amendment right to

22  challenge 10-2 state jury verdict); *Johnson v. Louisiana*, 406 U.S. 356, 359–63 (1972) (rejecting

23  due process challenge to 9-3 state jury verdict).  Similarly, "there is no general requirement that

24  the jury reach agreement on the preliminary factual issues which underlie the verdict."  *Schad v.*

25  *Arizona*, 501 U.S. 624, 631-32 (1991) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449

26  (1990) (Blackmun, J., concurring)).

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

**Analysis**

The California Court of Appeal denied this claim:

> Appellant argues that, as to both of the charged offenses, the court should, sua sponte, have instructed the jury that it had to agree unanimously "that the People have proved that the defendant committed at least one of [the acts charged] and you all agree on which act [he] committed." (CALCRIM No. 3500.)

> We disagree, for at least two separate and distinct reasons. First, and as our Supreme Court made clear recently in one of the leading cases on this issue, this sua sponte duty arises only "when the evidence suggests more than one discrete crime" and distinctly does not obtain "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed." (*People v. Russo* (2001) 25 Cal. 4th 1124, 1132 (*Russo*), cited and quoted in the Bench Notes to CALCRIM No. 3500 .)

> Second, but clearly related to this statement of the rule, there is also no such sua sponte duty to instruct if the offense constitutes a "continuous course of conduct." (*People v. Maury* (2003) 30 Cal.4th 342, 423.) As Division Five of this court has noted recently-and doing so by quoting a decision of our Division Three-this exception arises "'"when the acts are so closely connected that they form part of one and the same transaction, and thus one offense."'" (*People v. Napoles* (2002) 104 Cal. App. 4th 108, 115 (*Napoles*), quoting *People v. Avina* (1993) 14 Cal. App. 4th 1303, 1309.) FN15

> Both principles clearly apply here: the "roughhousing" with Reginald took place, according to all the testimony, exactly in the same room of the same apartment within an hour-or at the most two hours-of time on the same Sunday morning. Some of the "roughhousing" appellant described as forms of wrestling, i.e., "atomic elbow," the "knee drop," "coming off the top rope," etc. It was, at least per appellant's first recorded statement to the police, in connection with that latter "wrestling" maneuver that appellant's hip came down on Reginald's stomach. (See ante p. 7.) This statement, together with the testimony of Dr. Crawford and the results of the autopsy on Reginald, makes clear that there was both a "continuous course of conduct" here, i.e., "roughhouse wrestling" and, in any event, only one "discrete crime." (*Russo*, *supra*, at p. 1132.).

*Wyatt*, 2008 WL 258175, at *18 (footnotes omitted).

Because there is no federal constitutional right to a unanimous jury verdict, the trial court's failure to sua sponte give the instruction was not contrary to clearly established Supreme Court precedent, and Wyatt is therefore not entitled to habeas relief. *See Barreto v. Martel*, No. C 08-2008 MHP, 2010 WL 546586, at *13 (N.D. Cal. Feb. 10, 2010) ("Since a criminal defendant in a state prosecution is not entitled to a unanimous verdict at all under the federal Constitution, the

state court's determination that an instruction on jury unanimity was unnecessary under state law in the circumstances of the case cannot possibly be considered a violation of federal due process.").

## III.    CHILD ASSAULT HOMICIDE JURY INSTRUCTION

Wyatt contends that the jury instruction provided for child assault homicide, California Penal Code section 273ab(a), failed to instruct on the reasonable person test as required by the statute.

**Analysis**

The trial court instructed the jury as follows with respect to § 273ab(a):

> Now, the Defendant is charged in count two with killing a child under the age of eight by assaulting the child with force likely to produce great bodily injury.

> To prove that the Defendant is guilty of this crime, the People must prove the following:

> One, that the Defendant had the care or custody of the child who was under the age of eight;

> Two, he did an act that by its nature would directly and probably result in the application of force to the child;

> Three, he did that act willfully;

> Four, the force used was likely to produce great bodily injury;

> *Five, when he acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in great bodily injury to the child;*

> And six, when he acted, he had the present ability to apply force likely to produce great bodily injury to the child;

> And seven, his act caused the child's death.

RT at 1516-17 (emphasis added).

The trial court then stated:

> Someone commits an act willfully when he does it willingly or on purpose. It's not required that he intend to break the law or hurt someone else, or gain any kind of advantage.

> Great bodily injury, as I said before, means significant or substantial physical injury. It's an injury that is greater than minor or moderate harm.

An act causes death if:

The death was the natural and probable consequence of the act;

The act was a direct and substantial factor in causing the death;

And the death wouldn't have happened without the act.

*The natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, you should consider all of the circumstances established by the evidence.*

And a substantial factor, as I've used that term, is more than a trivial or remote factor. However, it doesn't need to be the only factor that caused death.

RT at 1517-18 (emphasis added).

The California Court of Appeal denied this claim in its 2010 opinion:

Appellant's argument that the court did not instruct the jury on the necessity of finding that the force used was such that a reasonable person would find it likely to produce great bodily injury does not hold up to scrutiny. The trial court certainly explained to the jury that child abuse homicide involves force that "was likely to produce great bodily injury" and that the jury could find appellant guilty of this count if it found that he "was aware of facts that would lead a reasonable person to realize that his act, by its nature would directly and probably result in great bodily injury to the child." The court also told the jury that the child's death must be the natural and probable consequence of the appellant's act, and that a "natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." In sum, the trial court correctly instructed the jury, under CALCRIM No. 820, that the force used must have appeared likely to a reasonable person to result in great bodily injury.

*Wyatt*, 2010 WL 5006753, at *18.

This decision was not unreasonable. The court noted that the jury instruction at issue twice referred to the "reasonable person" test. In closing argument the prosecutor also emphasized the reasonable person test. *See Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (the arguments of counsel may clarify a jury instruction). The prosecutor stated:

The next element: A reasonable person would have realized that his act, by his nature, would directly and probably result in the great bodily injury of the child. Remember what I told you about the folks who wrote these instructions? I mean that's wordy. That's wordy. Basically, a reasonable person would know that by doing that to a child could result in great bodily injury. The defendant had the present ability to apply force likely to produce great bodily

injury.

RT at 1539.

Wyatt has failed to show that there is a reasonable likelihood that the jury misapplied the instruction, especially as it repeatedly referred to the "reasonable person."   Even if there was an error with the jury instruction, it did not have a substantial and injurious influence in determining the jury's verdict.  This claim is denied.

**IV.     CRIMINAL NEGLIGENCE JURY INSTRUCTION**

Wyatt argues that the trial court erred in failing to sua sponte instruct that criminal negligence could not support an assault conviction and thereby failed to inform the jury of all the elements for child assault homicide.  He also argues that the trial court erred by not providing an instruction that injury alone is insufficient to establish an assault.

**Analysis**

The California Court of Appeal denied this claim:

> Here, in its instructions involving involuntary manslaughter, the court instructed the jury on the meaning of criminal negligence: "[M]ore than ordinary carelessness, inattention, or mistake in judgment.  The person acts with criminal negligence when: [¶] he acts in a reckless way that creates a high risk of death or great bodily injury...."  The court's instruction under CALCRIM No. 820 states that child abuse homicide involves force that "'to a reasonable person would be likely to produce great bodily injury,'" a degree of force that is not the same as that involving criminal negligence.

*Wyatt*, 2010 WL 5006753, at *19 (alterations and omission in original).  The appellate court found that the trial court was not required to issue a sua sponte instruction that a violation of section 273ab cannot be based on criminal negligence and that there was no error in failing to instruct that injury alone is insufficient to establish an assault.  *Id.*

The California Court of Appeal noted that the standard for child assault homicide is different than the standard for criminal negligence.  The child assault homicide instruction contained the proper standard, and the different standard for criminal negligence was provided in the involuntary manslaughter instruction.  Trial counsel did not request any additional instruction, and Wyatt contends that the trial court should have sua sponte issued an instruction noting this difference.

24

1    Wyatt has failed to show that even if the trial court erred in failing to note that criminal

2  negligence could not support child assault homicide any error so infected the entire trial that the

3  conviction violated due process.  The child assault homicide instruction was correct, and Wyatt

4  has not shown that there was any likelihood that the jury misapplied the instruction.   Wyatt has

5  not shown any error, let alone an error that had a substantial and injurious influence in determining

6  the jury's verdict.  *See Brecht*.  Nor is he entitled to habeas relief because the trial court failed to

7  sua sponte instruct that injury alone is insufficient to establish an assault.  There was an abundance

8  of evidence that Wyatt used a great deal of force on the victim that a reasonable person would

9  believe was likely to result in great bodily injury on a young child.  *Wyatt*, 48 Cal. 4th at 785.[2]

10  This claim is denied.[3]

11  **V.    SUFFICIENCY OF THE EVIDENCE**

12    Wyatt next argues there was insufficient evidence to support the conviction for child

13  assault homicide.

14    **Legal Standard**

15    The Due Process Clause "protects the accused against conviction except upon proof

16  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

17  charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

18  evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a

19  rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim,

20  *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas

21  relief, *see id*. at 324.

22    The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas

23  proceedings . . . ."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding

24  _____

25  [2] The 2008 California Court of Appeal opinion noted that misstatements by the prosecutor and the failure by trial counsel to request an instruction explaining that criminal negligence cannot support

26  the conviction increased the likelihood that the jury convicted Wyatt with insufficient evidence. *Wyatt*, 2008 WL 258175, at *15 n.11.  The California Supreme Court reversed this decision, and

27  Wyatt has not shown that the California Supreme Court denial was objectively unreasonable to warrant habeas relief under the exacting standard of 28 U.S.C. § 2254.

28  [3] To the extent that Wyatt argues trial counsel was ineffective for failing to request these instructions, he is not entitled to relief because he cannot show prejudice.

United States District Court
Northern District of California

that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction).   A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).   Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation.  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

**Analysis**

In 2008, the California Court of Appeal found that there was insufficient evidence to support the conviction for child assault homicide.  *Wyatt*, 2008 WL 258175, at *12-15.  The California Supreme Court reversed, finding that the court of appeal had misapplied the mens rea standard for assault under state law as described in *People v. Williams*, 26 Cal. 4th 779 (2001).  *Wyatt*, 48 Cal. 4th at 778.  The California Supreme Court stated:

> Under *Williams*, a defendant may commit an assault without realizing he is harming the victim, but the prosecution must prove the defendant was aware of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from the defendant's conduct.  Here, substantial evidence established that defendant knew he was striking his young son with his fist, forearm, knee, and elbow, and that he used an amount of force a reasonable person would realize was likely to result in great bodily injury.

*Id*. at 779.

The California Supreme Court recounted the evidence at trial including the physical evidence, the medical expert testimony concerning the injuries to the victim, the testimony of the victim's mother, the testimony of Wyatt's girlfriend, Wyatt's tape-recorded interviews, and Wyatt's own testimony at trial.  The court then found there was sufficient evidence to support the conviction for child abuse homicide:

United States District Court
Northern District of California

26

United States District Court
Northern District of California

Based on the foregoing evidence, a rational jury could find beyond a reasonable doubt that Reginald, who was 14 months old, died at the hands of defendant, a caretaker who intentionally used force that a reasonable person would believe was likely to cause great bodily injury. (*Williams*, *supra*, 26 Cal. 4th at p. 788, 111 Cal. Rptr. 2d 114, 29 P.3d 197; *Albritton*, *supra*, 67 Cal. App. 4th at p. 658, 79 Cal. Rptr. 2d 169.) First, defendant's own statements furnished substantial evidence that he intentionally acted to strike Reginald (*People v. Colantuono*, *supra*, 7 Cal. 4th at p. 214, 26 Cal. Rptr. 2d 908, 865 P.2d 704; *Rocha*, *supra*, 3 Cal.3d at p. 899, 92 Cal. Rptr. 172, 479 P.2d 372); by his own account, defendant was fully aware he was striking his son a number of times with his fist, forearm, knee, and elbow. Second, the physical evidence amply showed that Reginald suffered extensive injuries, including internal bleeding at multiple sites, multiple lacerations to the liver, acute rib fractures, and cerebral swelling. Third, expert testimony established that Reginald's injuries were likely caused by multiple impacts or instances of blunt force trauma, that blunt force trauma does not necessarily result in external bruising, especially in softer areas like the abdomen, and that Reginald's injuries were similar to the types of injuries seen only in the most serious events, such as when children are hit by cars or are in car crashes. Consequently, even though Reginald's body lacked external signs of significant trauma, the nature and extensiveness of his internal injuries provided sufficient evidence that defendant used an amount of force a reasonable person would believe was likely to result in great bodily injury to a young child. (*See People v. Stewart*, *supra*, 77 Cal. App. 4th at pp. 794-795, 91 Cal. Rptr. 2d 888; *Albritton*, *supra*, 67 Cal. App. 4th at p. 656, 79 Cal. Rptr. 2d 169.) On this record, we have no trouble concluding that substantial evidence supports defendant's conviction of child abuse homicide.

*Wyatt*, 48 Cal. 4th at 784-85.

Wyatt's argument regarding the required intent for assault under state law was rejected by the California Supreme Court. To the extent Wyatt argues that the California Supreme Court was incorrect in its analysis of state law, he is not entitled to habeas relief. The *Jackson* standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *see, e.g.*, *Boyer v. Belleque*, 659 F.3d 957, 968 (9th Cir. 2011) (concluding it was not unreasonable, in light of Oregon case law, for Oregon court to conclude that a rational jury could find beyond a reasonable doubt that petitioner intended to kill his victim based on proof that he anally penetrated several victims with knowledge that he could infect them with AIDS). The California Supreme Court's ruling on the state law issue is binding on this Court.

United States District Court
Northern District of California

1     However, "the minimum amount of evidence that the Due Process Clause requires to prove

2 the offense is purely a matter of federal law," *Coleman*, 132 S. Ct. at 2064, yet, Wyatt has not

3 shown that the California Supreme Court was objectively unreasonable in finding sufficient

4 evidence to support the conviction in light of the high bar for *Jackson* claims.  Evidence was

5 presented that the fourteen-month-old victim suffered extensive injuries at multiple places on his

6 body.  He had internal bleeding, lacerations of the liver, rib fractures, and cerebral swelling.

7 Expert testimony demonstrated that the victim's injuries were likely caused by multiple impacts or

8 multiple instances of blunt force trauma.  Wyatt's statements to police recounted that he had

9 intentionally used force that a reasonable person would believe was likely to cause great bodily

10 injury.  While Wyatt testified that his statements to the police were not accurate and that he

11 accidentally fell on his son once and then accidentally tripped and dropped him, the jury did not

12 credit this testimony or the testimony of the defense expert witness.  Viewing all of this evidence

13 in the light most favorable to the prosecution, the jury could have found the essential elements of

14 the crimes beyond a reasonable doubt.  Wyatt has failed to meet the high threshold of a sufficiency

15 of the evidence claim and he is not entitled to habeas relief.

16 **VI.    CERTIFICATE OF APPEALABILITY**

17     The federal rules governing habeas cases brought by state prisoners require a district court

18 that issues an order denying a habeas petition to either grant or deny therein a certificate of

19 appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

20     A judge shall grant a certificate of appealability "only if the applicant has made a

21 substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

22 certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district

23 court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

24 is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

25 court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S.

26 473, 484 (2000).

27     Here, petitioner has made no showing warranting a certificate and so none is granted.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

 For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

 **IT IS SO ORDERED.**

Dated:  November 20, 2015

              _____

              JAMES DONATO
              United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REGINALD W. WYATT,

           Plaintiff,

      v.

MARION SPEARMAN,

           Defendant.

Case No.  14-cv-00984-JD

**CERTIFICATE OF SERVICE**

       I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

       That on November 20, 2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Reginald W. Wyatt ID: #:F33546
Correctional Training Facility (CTF)
Highway 101 North
P.O. Box 705
Soledad, CA 93960

Dated: November 20, 2015

Susan Y. Soong
Clerk, United States District Court

By: *Lisa R. Clark*
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

United States District Court
Northern District of California